UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,

          No. 13-cr-68(1) (JRT/LIB)

v.

          **REPORT AND RECOMMENDATION**

(1) Michael D. Brown,

      Defendant.

---

This matter came before the undersigned United States Magistrate Judge upon Defendant's Motion to Dismiss the Indictment, [Docket No. 59]; his Motion to Dismiss the Indictment Due to Selective Prosecution, or for Additional Discovery, [Docket No. 58]; his Motion to Suppress Evidence Obtained as a Result of July 23, 2011, Search and Seizure, [Docket No. 57]; and his Motion to Suppress July 23, 2011, Statements, Admissions, and Answers, [Docket No. 55]. The case has been referred to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a hearing on July 2, 2013, regarding the Defendant's motions for discovery,[1] dismissal, and suppression. For reasons outlined below, the Court recommends the motions be **DENIED**.

I.      **BACKGROUND**

Michael D. Brown ("Defendant") is identified in the Indictment as an enrolled member of the Leech Lake Band of Chippewa Indians, and is one of two persons charged in the present case with one count each of Transportation, Sale and Purchase of Fish Taken in Violation of Tribal Law, in violation of 16 U.S.C. §§ 3372(a)(1) and 3373(d)(1), and Leech Lake Band of Chippewa

---

[1] Defendant's discovery motions were the subject of a separate Order. [Docket No. 66].

Indians Conservation Code §§ 22.01(2) and 23.01. (Indictment [Docket No. 1] at 2-3).

Defendant was indicted on April 9, 2013, and made the present motions on June 20, 2013. The

Court held an evidentiary hearing on July 2, 2013, and accepted evidence concerning the

suppression motions; the parties' request for additional time for briefing was granted, and both

Defendant and the Government provided supplemental briefs. (See Docket Nos. 68-70).

Defendant is presently scheduled to appear for trial before Hon. John R. Tunheim on September

23, 2013. (See Order [Docket No. 63]).

## II.    DEFENDANT'S MOTIONS TO DISMISS

### A. Defendant's Motion to Dismiss the Indictment [Docket No. 59]

Defendant Brown was indicted as part of "Operation Squarehook," a collaborative effort

among officials of the Federal Government, the Leech Lake Band of Chippewa Indians, the Red

Lake Band of Chippewa Indians, and the State of Minnesota to investigate and prosecute illegal

poaching and marketing of protected fish on the Leech Lake and Red Lake Reservations and in

Beltrami, Cass, Clearwater, Itasca, Pennington, and Polk Counties.[2] Defendant Brown is one of

ten persons who were indicted in four separate Federal cases: United States v. Brown, No. 13-cr-

68 (JRT/LIB); United States v. Reyes, No. 13-cr-70 (JRT/LIB); United States v. Bellefy, 13-cr-

71 (RHK/LIB); and United States v. Good, 13-cr-71 (JRT/LIB) (collectively, the "Federal

prosecutions").[3]

---

[2] See Def.'s Mot. Dismiss for Selective Prosecution, Ex. [Docket 58-1], at 2.
[3] In United States v. Brown, Defendant Michael D. Brown is identified in the Indictment as an enrolled member of the Leech Lake Band of Chippewa Indians; the Indictment does not indicate whether Defendant Michael J. Nei is an Indian.

In United States v. Reyes, Defendants Jerry A. Reyes, a/k/a/ "Otto Reyes," and Marc L. Lyons are identified in the Indictment as enrolled members of the Leech Lake Band of Chippewa Indians, and Defendant Frederick W. Tibbetts, a/k/a "Bud Tibbetts," is identified in the Indictment as an enrolled member of the White Earth Band of Chippewa Indians; the Indictment does not indicate whether Defendant Alan D. Hemme is an Indian.

Defendant here first argues that the Lacey Act does not apply to Indians. In the alternative, Defendant argues that, even if the Lacey Act applies to Indians, the Government's prosecution of him under the Lacey Act is invalid because the acts that the Indictment alleges he committed, even if true, would merely constitute the lawful exercise of his rights under the Treaty with the Chippewa, 7 Stat. 536 (July 29, 1837) (hereinafter, the "1837 Treaty"), and various other treaties. (See Docket No. 59).[4]

### 1. The Lacey Act applies to Indians.

Defendant argues that Congress never intended the Lacey Act to apply to Indians. The Court cannot agree with this argument, which is clearly contrary both to the plain language of the Lacey Act and to binding Eighth Circuit precedent. United States v. Big Eagle, 881 F.2d 539, 540 n.1 (8th Cir. 1989) (hereinafter "Big Eagle II") ("the Lacey Act, by its terms and definitions, applies to Indian people" (citing 16 U.S.C. § 3371(e) ("The term 'person' includes any individual . . . subject to the jurisdiction of the United States")). The Eighth Circuit's holding in Big Eagle II is consistent with the Ninth Circuit's decision in United States v. Sohappy. 770 F.2d 816 (9th Cir. 1985). Upon a review of the Lacey Act's legislative history, the Ninth Circuit held that Congress intended that the act apply to Indians:

> [T]he overall purpose in subjecting persons who traffic in illegally
> obtained fish to the stiffer Lacey Act penalties was to allow the Federal

---

The Indictment in United States v. Bellefy does not indicate whether Defendants Larry W. Bellefy, Thomas P. Sumner, or Brian Holthusen are Indians; however, Defendants Sumner and Holthusen identify themselves as enrolled members of the Red Lake Band of Chippewa Indians in their respective motions to dismiss for selective prosecution.

The Indictment in United States v. Good does not indicate whether Defendant Larry Good is an Indian; however, he identifies himself as an enrolled member of the Red Lake Band of Chippewa Indians in his motion to dismiss for selective prosecution.

[4] Seven of the ten defendants in the Federal prosecutions have moved for dismissal of the Indictment on the grounds that they were merely exercising their treaty rights, and at least some have sought to incorporate each other's arguments with regard to these motions. (See, e.g., United States v. Brown, No. 13-cr-68(1), Def.'s Supplementary Mem. Supp. Mot. Dismiss Indictment [Docket No. 69], at 1 ("We respectfully . . . join in the arguments filed on behalf of the Red Lake and Whtie Earth defendants in the 'Operation Squarehook' cases.").

Consequently, references in this Report and Recommendation to Defendant's arguments encompass not only those made by Defendant in the present case, but also to those made by defendants in the related cases.

Government to provide more adequate support for the full range of laws that protect wildlife.

Indians who traffic in illegal wildlife harm the Lacey Act's goal of wildlife preservation just as much as non-Indian traffickers. . . . To exempt Indians from these penalties would impede attainment of Congress' goal.

Id. at 821 (internal quotations, alternations, and citations to Congressional reports omitted).[5]

Defendant offers no authority—in particular, no binding Eighth Circuit or U.S. Supreme Court authority—to suggest that the Lacey Act does not apply to Indians. Therefore, the Court holds, consistent with Big Eagle II, that the Lacey Act does apply to Indians, and, consequently, that the Indictment is not facially improper.

### 2. The Government's prosecution of Defendant under the Lacey Act does not violate his treaty fishing rights.

Having determined that the Lacey Act applies to Indians, the Court next must determine whether the Government's prosecution of Defendant under the Lacey Act is improper as a punishment for the exercise of his right to fish, as guaranteed by treaties.

#### a. Standard of Review

"A prosecution designed solely to punish a defendant for exercising a valid legal right violates due process." United States v. Leathers, 354 F.3d 955, 961 (8th Cir. 2004) (citing Blackledge v. Perry, 417 U.S. 21, 25-26 (1974); United States v. Graham, 323 F.3d 603, 606 (8th Cir. 2003)). A defendant may demonstrate that he was prosecuted for an improper motive by either direct or circumstantial evidence. Id. (citing United States v. Beede, 974 F.2d 948, 951 (8th Cir. 1992)). However, "[i]t is the defendant's burden to show that the prosecution was brought in order to punish the defendant for the exercise of a legal right." Id. (citing United

---

[5] See also United States v. Big Eagle, 684 F. Supp. 241, 244 (D.S.D. 1988) ("The defendant next contends that the Court lacks subject matter jurisdiction to hear this action because the Lacey Act does not apply to Indians. The only United States Court of Appeals to decide this issue has held that the Lacey Act does apply to Indians. This Court is persuaded that the decision of the Ninth Circuit in United States v. Sohappy is correct and that the discussion of the issues raised in Sohappy is dispositive for purposes of deciding this motion" (citations omitted).).

States v. Kriens, 270 F.3d 597, 602 (8th Cir. 2001)).  The Eighth Circuit has repeatedly described the Defendant's evidentiary burden in proving an improper motive for prosecution as "a heavy one."  Id. (citing United States v. Kelley, 152 F.3d 881, 885-86 (8th Cir. 1998)).

**b.  Discussion**

The Court begins with the issues that are not in dispute.  First, in the present case, neither party disputes that the Chippewa Indians[6] in Minnesota generally have a right to fish on tribal land and within the territory ceded pursuant to the 1837 Treaty.  "As a general rule, Indian tribes have 'the power to manage the use of their territory and resources both by members and nonmembers.'"  United States v. Big Eagle, 684 F. Supp. 241, 245 (D.S.D. 1988) (hereinafter "Big Eagle I") (citing New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 335 (1983), aff'd Big Eagle II, 881 F.2d 539 (8th Cir. 1989), reh'g denied 1989 U.S. App. LEXIS 13872 (8th Cir. Sept. 8, 1989) (en banc), cert. denied 493 U.S. 1084 (1990).  "Although some treaties provide expressly that Indians have exclusive hunting, fishing, and gathering rights on their reservations, it is not necessary that the rights be referred to as "exclusive" in the treaty, or even that they be expressly mentioned.  Exclusive on-reservation hunting, fishing, and gathering rights are implied from the establishment of a reservation for the exclusive use of a tribe, whether the reservation was set aside by executive order, statute, agreement, or treaty."  1-18 Cohen's Handbook of Federal Indian Law § 18.03 (footnotes omitted).  "Such treaty rights can be asserted by . . . an individual member of the Tribe."  United States v. Dion, 476 U.S. 734, 738 n.4 (1986).

Additionally, although Defendant Brown argues that his prosecution under the Lacey Act is a violation of his treaty rights, Defendant *does not challenge* the Leech Lake Conservation Code sections that constitute the predicate offenses for his Lacey Act prosecution, nor does he challenge the application of those Code sections to him.  In fact, Defendant expressly

---

[6] Also known as Ojibwe or Anishinabe.

acknowledges tribal authority to regulate fishing within its territorial jurisdiction. (Mot. Dismiss Indictment [Docket No. 59], at 1 ("[T]he Chippewa tribes have a treaty-guaranteed right to control hunting, fishing and gathering on tribal lands, including Leech Lake")).

Finally, in the present case neither party disputes that the Lacey Act is a Federal statute of general applicability. Both Defendant and the Government acknowledge that "'federal laws of general applicability 'are applicable to the Indian unless there exists some treaty right which exempts the Indian from the operation of the particular statutes in question.'" United States v. Wadena, 152 F.3d 831, 846 (8th Cir. 1998) (quoting Sohappy, 770 F.2d at 819 (9th Cir. 1985) (quoting, in turn, United States v. Burns, 529 F.2d 114, 117 (9th Cir. 1975))). If a court determines that there is a treaty right that exempts Indians from the operation of a Federal statute of general applicability, the court next asks whether that treaty right was abrogated by Congress. A court generally will find that Congress has abrogated a treaty right only where there is explicit statutory language doing so. Dion, 476 U.S. at 738-39 (collecting cases).

The first question, then, is not, as Defendant urges, whether the Lacey Act abrogates his treaty right to take fish on the Leech Lake Reservation—a right that the Government acknowledges Defendant has. Rather, the Court must begin with this question: Does Defendant's treaty right exempt him from the operation of the Lacey Act?

> i. **The case law, both in the Eighth Circuit and elsewhere, supports the Government's assertion that Defendant's treaty right to fish does not exempt him from operation of the Lacey Act.**

> (a) **Sohappy and Stone**

The Ninth Circuit, in Sohappy, was the first court to address this question in detail, and it found that the defendants' treaty rights *did not* exempt them from the operation of the Lacey Act. 770 F.2d at 820. The defendants in Sohappy were convicted of violating the Lacey Act by

catching and selling fish in violation of tribal and state law.  Id. at 817.  They appealed, arguing

"that federal prosecution of Indians for violations of tribal fishing law violates Indian

sovereignty and Indian treaty reserved fishing rights."  Id.

The Ninth Circuit rejected those arguments.  With regard to the argument that a Lacey

Act prosecution would violate Indian tribal sovereignty, the court held that "Indian sovereignty is

necessarily limited and must not conflict with the overriding sovereignty of the United States."

Id. at 819 (internal citation and quotation omitted).  Additionally, the court held that a Lacey Act

prosecution does not impair Indian tribal sovereignty, but rather "supports tribal laws by

authorizing federal penalties for violations."  Id. at 819-20.  Furthermore, it held that a Lacey Act

prosecution does not violate reserved fishing rights because "the Indians do *not* have any treaty

reserved right to exercise *exclusive* jurisdiction over such fishing matters.  Nor is there "specific

language [in the treaties] . . . 'purporting to exempt Indians from the laws of general applicability

throughout the United States.'"  Id. at 820 (quoting Burns, 529 F.2d at 117 (emphasis and

alterations in Sohappy).

The Eighth Circuit expressly adopted this reasoning, albeit not in a Lacey Act case, in

United States v. Stone. 112 F.3d 971 (8th Cir. 1997).  In Stone, the defendant, an enrolled

member of the White Earth Band of Chippewa Indians, was convicted of violating the Airborne

Hunting Act[7] on the White Earth Indian Reservation.  112 F.3d at 972.  He appealed, arguing in

part that "the treaties between the Chippewa Indians and the United States vested the tribes with

jurisdiction over hunting, fishing and wild rice gathering and that therefore he cannot be

federally prosecuted for hunting on the reservation."  Id. at 973.  The Eighth Circuit, citing

Sohappy with approval, rejected this argument:

---

[7] 16 U.S.C. § 742j-l.

As the Ninth Circuit pointed out, however, despite the fishing rights contained in a treaty, "Indians do not have any treaty reserved right to exercise exclusive jurisdiction over such fishing matters." United States v. Sohappy, 770 F.2d 816, 820 (9th Cir. 1985) (upholding federal jurisdiction over an Indian on the reservation under federal statute criminalizing transporting, selling, or acquiring fish). "Indian sovereignty is 'necessarily limited' and must not conflict with the overriding sovereignty of the United States." Id. at 819. Federal laws of general applicability "are applicable to the Indian unless there exists some treaty right which exempts the Indian from the operation of the particular statutes in question." Burns, 529 F.2d at 117; Sohappy, 770 F.2d at 820 (quoting Burns, 529 F.2d at 117). . . . [A]s in Sohappy, federal jurisdiction under the Airborne Hunting Act is not "disruptive of tribal authority, for rather than overturning basic tribal regulations, it supports the tribal laws by authorizing federal penalties for violations," and its enforcement against an Indian on Indian land is proper. Id. at 819-20.

Stone, 112 F.3d at 973-74.

Defendant argues that neither Sohappy nor Stone controls the present case. First, Defendant argues that Sohappy is inapplicable, because the treaty at issue in that case provided for a tribal "right to take fish at all 'usual and accustomed places' [which] was not exclusive but was to be shared 'in common with the citizens of the Territory.'" 770 F.2d at 819. In contrast, Defendant argues that the Chippewa Indians retain exclusive fishing rights on their reservations. Defendant misses the point. The issue described by the court in Sohappy was whether the treaty reserved exclusivity as to "*jurisdiction over enforcement* of tribal fishing law against Indians." 770 F.2d at 818. Defendant has provided no evidence of any treaty language, or any other authority, that reserves to the Chippewa Indians exclusive jurisdiction—to the exclusion of the United States—over enforcement of on-reservation fishing regulations.

Defendant also argues Stone is inapplicable because it did not concern fishing rights. The Court is not persuaded. Although Stone was prosecuted for a hunting violation and not a fishing violation, the defendant's argument in that case was substantially the same as the Defendant's argument in the present case: that his Federal prosecution violated the usufructuary

rights he was guaranteed by one or more treaties.  Defendant offers no reason, and the Court can think of none, that the distinction between hunting and fishing would be material.

### (b) Big Eagle I and II.

Three years after the Ninth Circuit decided Sohappy, the U.S. District Court for the District of South Dakota denied a motion to dismiss that raised substantially the same questions at issue in the present case.  In Big Eagle I, the defendant was an enrolled member of the Crow Creek Sioux Tribe, and was charged with a Lacey Act violation, the predicate offense being a violation of the fishing regulations contained in the Lower Brule Sioux Tribe's Wildlife Management Code.  684 F. Supp. at 242-43.  The defendant argued that the Fort Laramie Treaty of 1868, 15 Stat. 635 (Apr. 29, 1968), guaranteed him a right to fish where he did.  684 F. Supp. at 244.  The court concluded that the exercise of such a right could be regulated either by lawfully enacted tribal regulation, or by its explicit abrogation under Federal law.  Id. at 246 ("Neither the Lacey Act nor the Lower Brule Wildlife Management Code 'takes away the rights of Indians to fish in the Missouri River,' as the defendant argues.  Rather, Indians retain the right to fish in accordance with tribal regulations except as these rights may be expressly abrogated by federal law.").

Upon a review of various Sioux treaties, the Court concluded that those treaties "may be construed to authorize regulation of fishing by the Indians within each reservation," and that various Sioux tribes (including the Lower Brule) had enacted "their own fishing regulations.  Id. at 245.  Because the Lower Brule Sioux Tribe had enacted regulations governing the exercise of treaty rights within the Lower Brule Reservation, and because those regulations governed the defendant's actions, and because the defendant's violation of those regulations precipitated his

prosecution under the Lacey Act, that prosecution did not constitute a *Federal* abrogation of his treaty rights.  Id. at 244-46.[8]

> **(c) Defendant presents <u>no</u> case law in which a court has held that an Indian's treaty rights exempt him from operation of the Lacey Act.**

Defendant presents no authority, and this Court has found none, holding that an Indian's treaty rights exempt him from operation of the Lacey Act.  Instead, Defendant relies on cases that only generally address tribal usufructuary rights and cases holding that certain Federal prosecutions under acts other than the Lacey Act abrogated Indian treaty rights.

Defendant does not specifically address the rationale of <u>Big Eagle I</u>, but instead argues that <u>Sohappy</u>, <u>Stone</u>, and <u>Big Eagle</u> (presumably both <u>I</u> and <u>II</u>) were effectively reversed by the U.S. Supreme Court's decision in <u>Minnesota v. Mille Lacs Band of Chippewa Indians</u>, 526 U.S. 172 (1999).  However, <u>Mille Lacs</u> has no bearing on the present case, for two reasons: First, <u>Mille Lacs</u> did not, as Defendant suggests, expand the Indians' *on-reservation* usufructuary rights that were addressed in <u>Stone</u>, but instead confirmed that the Chippewa Indians reserved rights to hunt, fish, and gather *off-reservation* in the "ceded territory."  526 U.S. at 204. Defendant is charged with an on-reservation offense.[9]  Thus, <u>Mille Lacs</u> does not apply.

Second, <u>Mille Lacs</u> held that treaties limited the *State's* authority to infringe Chippewa Indians' usufructuary rights—it says nothing about the *Federal Government's* authority to prosecute pursuant to a law of general applicability:

> [T]he 1837 Treaty gave the Chippewa the right to hunt, fish, and gather in the ceded territory *free of territorial, and later state, regulation*, a privilege that others did not enjoy.  Today, *this freedom from state regulation curtails the*

---

[8] Although the Eighth Circuit did not specifically address this argument in <u>Big Eagle II</u>, it did affirm the District Court's denial of the defendant's motion to dismiss.

[9] The Indictment alleges that Defendant violated the Leech Lake Conservation Code; thus, he is charged under the Lacey Act for an alleged violation of "Indian tribal law."  <u>See</u> 16 U.S.C. § 3372(a)(1).  The Lacey Act "Indian tribal law" provision applies only to conduct "within Indian country defined in section 1151 of title 18."  16 U.S.C. § 3371(c).

> *State's ability to regulate hunting, fishing, and gathering by the Chippewa in the ceded lands.*

Id. (emphasis added). "The federal government can regulate fishing concurrently with the Indian tribes in the interest of conservation." Big Eagle, 684 F. Supp. at 244 (citing Sohappy, 770 F. Supp. at 819); see also Stone, 112 F.3d at 973-74.

Defendant also urges the Court to follow United States v. White, 508 F.2d 453 (8th Cir. 1974). In White, the defendant, a member of the Red Lake Band of Chippewa Indians, was seen shooting a bald eagle on the Red Lake Indian Reservation, and was charged with unlawful taking under the Bald and Golden Eagle Protection Act (the "BGEPA"), 16 U.S.C. § 668(a). White, 508 F.2d at 454. The District Court dismissed on the grounds that the defendant was legally exercising his treaty guaranteed right to hunt on the reservation, and the Eighth Circuit affirmed on the same grounds. Id. at 454, 457. In particular, the Eighth Circuit held that Congress, in enacting the BGEPA, had not explicitly abrogated Indian treaty rights to hunt eagles and, therefore, that Defendant was legally exercising his hunting right.

However, prosecution under the BGEPA, unlike the Lacey Act, is not premised upon a predicate violation of a tribal wildlife law. Thus, in White the court was presented only with the question of whether the BGEPA abrogated the defendant's treaty right.

In the present case, the Court need not reach the question of whether Defendant's treaty right to fish was abrogated by the Lacey Act, because the Court finds that the Leech Lake Band's Conservation Code legitimately limits the scope of this right, such that Defendant's right to fish does not excuse him from the operation of the Lacey Act. See Wadena, 152 F.3d at 846 (Federal statute of general applicability applies to Indians unless treaty right *excuses them from operation of the statute*, or the right has been explicitly abrogated).

### ii.  Summary

"Tribal wildlife laws are *per se* valid against tribe members."  United States v. Williams, 898 F.2d 727, 729 (9th Cir. 1990); see also Big Eagle I, 684 F. Supp. at 244-46.  In fact, Defendant does not challenge the authority of the Leech Lake Band's Conservation Code.  Thus, it is the Conservation Code that specifies how Defendant may exercise his right to fish.  Additionally, "the exercise of federal jurisdiction under the Lacey Act . . . supports tribal laws by authorizing federal penalties for violations."  Sohappy, 770 F.2d at 819-20; see also Big Eagle I, 684 F. Supp. at 244 ("[t]he federal government can regulate fishing concurrently with the Indian tribes in the interest of conservation").[10]  Defendant's attempts to distinguish Sohappy, Stone, and Big Eagle are unavailing.  Therefore, applying the reasoning in those cases, the Court finds that although Defendant generally has a right to fish guaranteed by the various Chippewa Indian treaties, that right is (1) subject to lawful regulation by the Chippewa Indian tribes, and (2) the Federal Government has concurrent jurisdiction with regard to enforcement of tribal wildlife regulations affecting that right.

Accordingly, Defendant's treaty right does not exempt him from the operation of the Lacey Act and its incorporation of tribal wildlife law.  Because Defendant's treaty right does not

---

[10] Defendant argues that, under United States v. Jackson, 600 F.2d 1283 (9th Cir. 1979), the federal government lacks the authority to prosecute a violation of a tribal wildlife ordinance.  However, Jackson is easily distinguished from the present case, as the nature of the federal statute at issue in Jackson is very different from the Lacey Act.  In Jackson, the prosecution was brought under 18 U.S.C. § 1165, "which provides:

> Whoever, without lawful authority or permission, willfully and knowingly goes upon any land that belongs to any . . . Indian tribe, . . . for the purpose of hunting, . . . shall be fined not more than $200 or imprisoned not more than ninety days, or both, and all game, fish, and peltries in his possession shall be forfeited.

Jackson, 600 F.2d at 1284 (quoting 18 U.S.C. § 1165).  Thus, in Jackson, the defendant, who was an enrolled member of the Confederated Tribes of the Umatilla Reservation, was in essence charged with a trespass upon Indian land—an Indian-on-Indian crime.  The Jackson court held that "in the absence of an explicit Congressional directive, Indian tribes have exclusive criminal jurisdiction over offenses committed by one Indian against another Indian."  600 F.2d at 1285.

By contrast, in the present case Defendant is not charged with committing an offense against another Indian, but instead is charged with committing an offense "against tribal law and federal law (through the Lacey Act's incorporation of tribal law) designed to preserve fishing opportunities of Indians *and* non-Indians."  Sohappy, 770 F.2d at 819 (emphasis in original).

exempt him from the operation of the Lacey Act, a Federal statute of general applicability, the Court need not determine whether Congress explicitly abrogated that treaty right. See Wadena, 152 F.3d at 846.

While "[a] prosecution designed solely to punish a defendant for exercising a valid legal right violates due process," Leathers, 354 F.3d at 961, in the present case, Defendant has not met his burden of showing that the right he asserts—his treaty-based right to fish on the Leech Lake Indian Reservation—exempts him from the operation of the Lacey Act. Consequently, the Court recommends that Defendant's Motion to Dismiss, [Docket No. 59], be **DENIED**.

**B. Defendant's Motion to Dismiss the Indictment Due to Selective Prosecution, or for Additional Discovery [Docket No. 58]**

Defendant Brown alleges that he is a victim of selective prosecution and moves for dismissal, or, in the alternative, for additional discovery into the alleged selective prosecution. (See Docket No. 58).

**1. Standard of Review**

"In order to make a prima facie case of selective prosecution, [a defendant] must show: (1) people similarly situated to him were not prosecuted; and (2) the decision to prosecute was motivated by a discriminatory purpose." United States v. Hirsch, 360 F.3d 860, 864 (8th Cir. 2004) (citing United States v. Perry, 152 F.3d 900, 903 (8th Cir. 1998)). The defendant "has the burden of proving the government engaged in selective prosecution." Id. (citing United States v. Kelley, 152 F.3d 881, 885 (8th Cir. 1998)). "The 'evidentiary burden is a heavy one.'" United States v. Peterson, 652 F.3d 979, 981 (8th Cir. 2011) (quoting United States v. Leathers, 354 F.3d 955, 961-62 (8th Cir. 2004)).

A defendant seeking discovery regarding his selection prosecution claim "must present some evidence that tends to show the existence of both elements." United States v. Perry, 152

F.3d 900, 903 (8th Cir. 1998) (citing United States v. Armstrong, 517 U.S. 456, 468-69 (1996)).

"The justifications for a rigorous standard for the elements of a selective prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such claim." Armstrong, 517 U.S. at 468; see also United States v. Venable, 666 F.3d 893, 900 (4th Cir. 2012) ("Because discovery imposes high costs on the government, the standard for obtaining discovery in support of a selective prosecution claim is only slightly lower than for a dismissal of the indictment; rather than presenting clear evidence, the 'defendant must produce 'some evidence' making a 'credible showing' of both discriminatory effect and discriminatory intent" (quoting United States v. Olvis, 97 F.3d 739, 743 (4th Cir. 1996) (quoting, in turn, Armstrong, 517 U.S. at 470))).

### 2.  Facts

Defendant was indicted as part of "Operation Squarehook," a collaborative effort among officials of the Federal Government, the Leech Lake Band of Chippewa Indians, the Red Lake Band of Chippewa Indians, and the State of Minnesota to investigate and prosecute illegal poaching and marketing of protected fish on the Leech Lake and Red Lake Reservations and in Beltrami, Cass, Clearwater, Itasca, Pennington, and Polk Counties.  (Def.'s Mot. Dismiss Selective Prosecution, Exhibit [Docket No. 58-1], at 1-3).[11]

Defendant Brown is one of ten persons who were indicted in four separate Federal cases; in each of these Federal prosecutions, the government has alleged violations sufficient to invoke criminal penalties, subjecting the Defendants to a potential fine of up to $20,000.00, and/or a potential prison sentence of up to five years.  Of the ten individuals charged in these separate

---

[11] Defendant's exhibits, [Docket No. 58-1] are not individually numbered.  They consist of the following:
- **At 1**: Minnesota Dep't Natural Res., Operation Squarehook – State charges by county (undated).
- **At 2-4**: Press Release, U.S. Attorney's Office, District of Minnesota, Ten Indicted In Connection With Illegal Poaching of Walleye On Leech Lake And Red Lake (April 10, 2013).
- **At 5-7**: Minnesota Dep't of Natural Resources, "Operation Squarehook: Investigation of illegal sales of game fish results in more charges," Brainerd Dispatch, April 15, 2013 (printed from internet).
- **At 8-10**: Bill Hudson, "31 charged As DNR Nets Walleye Poaching Ring," WCCO, April 15, 2013 (printed from internet).

Federal prosecutions, four are identified in the various indictments as Indians and three others self-identify as Indians in various pleadings.[12]

Defendant proffers that State prosecutors in six counties have charged a total of twenty-one persons with various misdemeanor and gross misdemeanor charges. (Def.'s Ex. at 1). Defendants in the State prosecutions are subject to a possible fine of not less than $3,000.00 and not more than $10,000, and/or a potential jail sentence of not less than ninety days and not more than one year. See Minn. Stat. §§ 97A.301, 97A.325. There is no evidence in the record offered by the movant identifying any of the defendants in the State prosecutions, stating one way or the other definitively whether any of them are Indian, or suggesting that the factual circumstances in the State prosecutions are substantially identical to those of the present case.

### 3. Discussion

In moving to dismiss on the basis of an allegation of selective prosecution, Defendant has the burden of proving both that persons similarly situated to him were not prosecuted, and that the prosecution decisions were made with a discriminatory purpose or intent. Hirsch, 360 F.3d at 864. Because, on the present record, Defendant has shown no evidence of either necessary factor in order to meet his initial burden, he has failed to demonstrate that he is entitled to dismissal of the Indictment or that he should be entitled to any additional discovery on the subject.

### a. Defendant has not shown that he was treated differently from similarly situated persons.

First, Defendant has failed to identify any similarly situated persons who were **not** prosecuted. "Defendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." Venable, 666 F.3d at 900-01 (citing Olvis, 97 F.3d at 744).

_____

[12] For the information in this paragraph, see fn.3, supra.

Defendant appears to argue solely and conclusorily that the twenty-one persons subject to the State prosecutions are similarly situated to him. Presumably Defendant contends that the State defendants are similarly situated on the sole basis that they may have been identified in the same Operation Squarehook investigation.[13] But there is little, if any, evidence in the present record that those persons are, in fact, similarly situated to Defendant. For example, the Lacey Act makes it illegal "to import, export, transport, sell, receive, acquire, or purchase any fish . . . taken, possessed, transported, or sold *in violation of any law, treaty, or regulation of the United States or in violation of any Indian tribal law*." 16 U.S.C. § 3372(a)(1) (emphasis added). Defendant has not demonstrated that any of the subjects of the State prosecutions—or any other person he conclusorily asserts may be similarly situated to himself—violated any Federal or Tribal law or regulation, as opposed to violating only State law.

In fact, for a Federal prosecutor deciding whether to prosecute two persons, the mere fact that a state authority has elected to prosecute one of them may be a "legitimate prosecutorial factor" serving to distinguish the two. Id. at 901.

Because Defendant has failed to meet his threshold burden to show clear evidence, much less any credible evidence, to demonstrate that he was treated differently from other similarly situated persons—or even that there *are* any persons similarly situated to Defendant for purposes of the present case—he has failed to show selective prosecution.

---

[13] The precise contours of Defendant's argument are not entirely clear, because he does not identify the *specific* persons he believes are similarly situated to himself. Defendant appears to argue that the twenty-one persons prosecuted by the State are the similarly situated persons; thus, he does not argue that the similarly situated persons were *not prosecuted*, but, rather, argues that those persons were *prosecuted by the State and not the Federal government*, and, as a result, were subjected to potentially lesser penalties than he.

**b. Even if Defendant had identified similarly situated persons <u>and</u> shown that he was treated differently from them, he nevertheless has failed to demonstrate that any such differentiation was the result of a discriminatory improper motive.**

Defendant argues that he and other Indians were subjected to Federal prosecution, while non-Indians were instead subjected only to State prosecution. (<u>See</u> Mot. Dismiss Selective Prosecution [Docket No. 58]). He alleges that this alone is evidence of a racially discriminatory motive in the federal charging decisions. (<u>Id.</u>). However, in addition to his previously addressed failure to demonstrate even some credible evidence that the defendants in the State prosecutions actually *are* similarly situated to him,[14] Defendant also fails to demonstrate any evidence in the record to show beyond mere allegation that any charging differentiation is the result of improper motive.

Defendant appears to start from the flawed premise that any distinction in the prosecutions of Indian tribal members and non-Indians is necessarily per se an impermissible "racial" distinction. In fact, the federal courts have repeatedly held that treating Indian tribal members differently from non-Indians for incidents arising in Indian country does not violate either due process or equal protection. <u>See, e.g.</u>, <u>United States v. Antelope</u>, 430 U.S. 641, 646-47 (1977) (holding that "respondents were not subjected to federal criminal jurisdiction because they are of the Indian race but because they are enrolled members of the Coeur d'Alene Tribe. We therefore conclude that the federal criminal statutes enforced here are based neither in whole nor in part upon impermissible racial classifications."); <u>Fisher v. District Court</u>, 424 U.S. 382, 390 (1976) (in civil case, "we reject the argument that denying [the Indian plaintiffs] access to the Montana courts constitutes impermissible racial discrimination. The exclusive jurisdiction of the Tribal Court does not derive from the race of the plaintiff but rather from the quasi-sovereign

---

[14] <u>See</u> Part II.B.3.a, <u>supra</u>.

status of the Northern Cheyenne Tribe under federal law."); <u>United States v. Aanerud</u>, 893 F.2d 956, 960 (8th Cir. 1990) (upholding prosecution of non-Indians for harvesting leeches on the White Earth Reservation against selective prosecution challenge because "members of the White Earth Band and non-members are simply not similarly situated with regard to their respective rights to trap leeches within the confines of the Reservation.")

Defendant also fails to prove that there is any "racial" distinction between himself and the other Indian tribal member Defendants in the four separate Federal prosecutions, on the one hand, and the subjects of the State prosecution on the other hand.  Defendant offers only a news report that states that "[t]en members of the Red Lake and Leech Lake bands are charged in Federal Court," while "another 21 non-tribal buyers and sellers are now facing state charges." (Def.'s Ex. at 9).[15]  The superficial, perfunctory news article representation of the "racial" make-up of the Defendants in the Federal prosecutions compared to the State prosecutions on which Defendant relies is at odds with the evidence in the record which shows only seven of the ten Federal defendants in the four separate Federal prosecutions are identified as Indian.  <u>See</u> fn.3, <u>supra</u>.  If the news report upon which Defendant relies does not even accurately reflect whether all, or only some, of the Defendants in the four separate Federal prosecutions are Indian, then the same article cannot be a credible source of evidence as to accurately reflect whether all, or only some, of the subjects of the State prosecutions are non-Indian.  Defendant has the burden of proving selective prosecution, and he might have examined the actual case files of the defendants

---

[15] <u>See also</u> Def.'s Ex. [Docket No. 58-1], at 6 (describing Defendants in the federal prosecutions as "10 tribal members").

Defendant states that "at least eight of the ten federal defendants are Native American, and are enrolled members of an Indian tribe in the state of Minnesota."  (Mot. Dismiss Selective Prosecution [Docket No. 58] at 1).  Defendant does not account for the discrepancy between his count of eight Indian defendants, and the seven who are identified as Indian in the record.

in the State prosecutions to ascertain whether there is evidence to demonstrate their racial makeup.  However, Defendant has not done so on the present record.

Finally, even assuming, *arguendo*, that Defendant had demonstrated that there was a clear racial distinction between himself and other Defendants in the Federal prosecutions, and those persons subject to the State prosecutions, "'[t]o establish discriminatory effect in a race case, the claimant must show people of another race violated the law and the law was not enforced against them.'"  See United States v. Hare, 308 F. Supp. 2d 955, 991 (D. Neb. 2004) (with regard to selective enforcement defense) (quoting United States v. Bell, 86 F.3d 820, 823 (8th Cir. 1996)).  Defendant has not even demonstrated that any of the subjects of the State prosecutions violated the Lacey Act and were not prosecuted in Federal court, and, therefore, Defendant has failed to demonstrate any actual discriminatory effect on the present record.

Because Defendant Brown has failed to show either of the two material elements necessary to dismiss an indictment on the basis of selective prosecution, the Court recommends that his Motion to Dismiss Indictment due to Selective Prosecution, or for Additional Discovery, [Docket No. 58], be **DENIED**.

## III.    DEFENDANT'S SUPPRESSION MOTIONS

### A. Facts

#### 1.   Search Warrants[16]

Special Agent Patrick Lund ("SA Lund") of the U.S. Fish and Wildlife Service ("USFWS") made the application and swore out the attached Affidavit based on his own

---

[16] The facts in this Part are derived from: **Government's Exhibit 2**: A warrant issued July 21, 2011, for the search and seizure of Defendant, and the application for and affidavit in support of said warrant; and **Government's Exhibit 3**: A warrant issued July 21, 2011, for the search of Defendant's residence and seizure of evidence related to the crimes alleged in the Indictment, and the application for and affidavit in support of said warrant.  The factual allegations contained in the two affidavits are substantially similar.

investigation as well as information he obtained in conversations with/from the investigative reports of various wildlife agents representing, among others, Minnesota Department of Natural Resources ("MDNR"), the Idaho Department of Fish and Game ("IDFG"), the South Dakota Department of Fish, Game and Parks ("SDDFGP"). (Gov't's Ex. 2, Aff. Lund at 1, ¶¶ 1, 4). Agents investigating Operation Squarehook had reason to believe that thousands of walleye and other game fish were being taken from the Leech Lake Indian Reservation, in violation of the Leech Lake Band Conservation Code, for sale to non-Indians. (Id. at 3-4, ¶ 12). Defendant had been identified to the investigating agents as "one of the most prolific participants in this black market." (Id. at 4, ¶ 12).

As part of their investigation, IDFG Senior Conservation Officer Dwight Scudder ("SCO Scudder") and SDDFGP Special Investigator Jeff McEntee ("SI McEntee") (together, "the officers") made undercover contact with Defendant on May 7, 2010, at Defendant's fish camp on the east side of Cass Lake,[17] within the boundaries of the Leech Lake Indian Reservation. (Id. at 4, ¶ 14). Subsequently, SCO Scudder received a phone call from Defendant and was able to identify Defendant's phone number. (Id. at 4, ¶ 15). This was the first of several meetings between the officers and Defendant during the months of May 2010 through September 2010. (See Id. at 4-7, ¶¶ 15-25). During those meetings and related phone conversations, Defendant described his fishing operations on both the east and west sides of Lake Winnibigoshish, in addition to the operations at his fish camp. (Id. at 5, ¶ 18; at 6, ¶ 21).

On July 24, 2010, the officers met again with Defendant, who showed them his fishing equipment and told them he could sell them fish, but that they "needed to be really careful as he could not legally sell fish." (Id. at 4-5, ¶ 16). Defendant also informed the officers of his new

---

[17] Hereinafter, all references to "Defendant's fish camp" are to his operation on the east side of Cass Lake, unless otherwise specified.

phone number. (Id.). Two days later, on June 26, 2010, SCO Scudder and SI McEntee met again with Defendant at his fish camp, where they purchased from him 100 walleye fillets, one whole walleye, and one whole musky, for $220.00. (Id. at 5, ¶ 17). That was the first of more than half-a-dozen purchases that SCO Scudder, either by himself or with SI McEntee, made from Defendant (who sometimes worked with associates). (Id. at 5-10, ¶¶ 17-41). Most of those sales were in person at Defendant's fish camp, but one took place at the Cass Lake Rest Stop in Cass Lake, Minnesota, and Defendant twice shipped fish to SCO Scudder in Idaho. (Id.). In all, the officers paid Defendant approximately $1,725.00 in exchange for approximately 567 walleye fillets, thirty-nine whole walleye, eight whole northern pike, one whole northern musky, and five large whole walleye suitable for mounting. (Id.).

On July 19, 2011, SCO Scudder recorded a telephone conversation with Defendant, during which Defendant said that he had saved some fish for SCO Scudder, provided SCO Scudder with his home address, and said he would meet with SCO Scudder at his home on the morning of July 23, 2011. (Id. at 10, ¶ 42).

In his Affidavit, SA Lund describes certain electronic evidence that he intended to seize, including mobile telephones and related equipment. (Id. at 10-13, ¶ 44).

SA Lund swore out his affidavit before U.S. Magistrate Judge Jeffrey J. Keyes on July 21, 2011, and Magistrate Judge Keyes issued the search and seizure warrant the same day. Attachments to the warrant included a photograph and description of Defendant, and descriptions of the evidence to be seized.

## 2. Defendant's Statements[18]

At approximately 8:00 a.m. on July 23, 2011, approximately seven officers from the MDNR and two officers from the USFWS arrived at Defendant's residence to execute search and seizure warrants on the residence and on Defendant's person.[19] MDNR Officer Traci Hanson ("Officer Hanson") stated that she was uniformed and armed, with her weapon holstered, but that some officers might have had their weapons drawn during the initial sweep to ensure that the residence was clear.

Defendant was outside in his yard when law enforcement arrived. He sat at a picnic table in the yard, and officers kept him outside the house while they searched the residence. After some time had passed,[20] MDNR Officer USFWS Special Agent Brad Merrill ("SA Merrill") showed Defendant a copy of the search warrants, and SA Merrill and MDNR Officer Traci Hanson ("Officer Hanson") (together, "the interviewing officers") began a recorded interview with Defendant. SA Merrill offered Defendant a cigarette, which Defendant accepted. Approximately 1 minute and 40 seconds into the recording, the following exchange took place:

> **SA Merrill**: Real quick, before we get started on this, 'cause we got a bunch of cops around your place today, you need to know you've got the right to a lawyer.
>
> **Defendant**: No, yeah, I know that.
>
> **SA Merrill**: If you can't afford one . . .

---

[18] Unless otherwise indicated, the facts in this Part are derived from the testimony of Minnesota Department of Natural Resources Conservation Officer Traci Hanson at the July 2, 2013, motions and evidentiary hearing, and from **Government's Exhibit 1**, a compact disc that contains four (4) separate recordings of the interviews with Defendant on July 23, 2011, including two (2) recordings of the interview outside Defendant's home, and two (2) recordings of the subsequent interview at the Cass Count jail; which the Government offered, and the Court accepted into evidence, for the purposes of this motion.

[19] The officers also knew that Defenant had "a lengthy criminal history including convictions for alcohol related driving offenses, driving after cancellation, fleeing a police officer, theft, contempt of court, careless driving, reckless driving, 5th degree (domestic) assault, disorderly conduct, [d]omestic abuse-violation of order for protection (felony), and dangerous weapons." (Gov't's Ex. 2, Aff. Lund at 4, ¶ 13).

[20] Defendant implied that it had been an hour, while the interviewing officers stated that it had not been a full hour. The exact amount of time that elapsed between the arrival of the officers to execute the search warrant and the beginning of the interviewing officers' recorded interview with Defendant is immaterial.

**Defendant**:    I know.

**SA Merrill**:    . . . the government will give you one. You know you have the right to remain silent. Nobody's forcing you to talk to us. You don't have to talk to me if you don't want to. I tell you what, there's some stuff I'd like to visit with you about, because I think we can get some things straightened out. Is it OK that I ask you some questions . . .

**Defendant**:    Yeah, yeah.

**SA Merrill**:    . . . and talk to you? Maybe we can work this out?

**Defendant**:    Yeah, let's just do it.

Defendant did not ask for an attorney, and he did not ask seek to terminate the interview, so the interview proceeded. Approximately 7 minutes and 35 seconds into the interview, the following exchange took place:

**Defendant**:    Maybe I should get an attorney.

**SA Merrill**:    It's up to you. You can do what you want to do.

**Defendant**:    I hate doing it like that. I hate them frickin' attorneys because they're jackasses, you know?

**SA Merrill**:    This is the thing—I want to talk to you, but you don't have to talk to me if you don't want to.

Again, Defendant did not expressly ask for an attorney, and did not seek to end the interview, which continued for approximately 1 hour and 40 minutes while Defendant and the interviewing officers discussed the investigation.

Early in the interview, Defendant accepted the cigarette offered by SA Merrill, and Defendant was later allowed to go inside to get a drink. Both before and during the interview, Defendant exhibited some signs of illness. At the beginning of the recorded interview, SA Merrill asks whether Defendant is OK. Officer Hanson testified at the July 2, 2013, motions

hearing that Defendant had said that he was ill, but did not specify the nature of his illness, and did not at any time ask for or seek access to medication. Approximately 1 hour, 1 minute and 40 seconds into the recorded interview Defendant can be heard retching, prompting the following exchange:

> **Defendant**: (Retching). Oh my god.
>
> **SA Merrill**: You alright? You need to get something to drink?
>
> **Defendant**: No, I'm good. I'm good. Nerves. Stress. . . . Oh my god. I'm going to get up.
>
> **Officer Hanson**: We want you to be comfortable.
>
> **Defendant**: (Retching).
>
> (Approximately 2 minutes passes while Defendant apparently is away from the picnic table.)
>
> **SA Merrill**: Hey Mike, let's finish up. You feelin' alright?
>
> **Defendant**: There's papers blowing all over.
>
> **SA Merrill**: Yeah, that's the way it is.
>
> **Defendant**: I'm really sick.

Again, the interview continues. Approximately 1 hour, 7 minutes and 45 seconds into the recorded interview, Officer Hanson said that she had a few additional questions for Defendant. Defendant said he did not want to talk anymore because he was getting nauseated. However, when Officer Hanson referred to her questions as "easy ones," Defendant said, "go ahead," and he continued to answer Officer Hanson's questions. Approximately 1 hour, 12 minutes and 40 seconds into the recorded interview, Defendant stated:

> **SA Merrill**: I'm done. I'm done. Alright, I'm done. I'm getting fucking sick.
>
> **Defendant**: You alright

|              |                                                                                                                                                             |
|--------------|-------------------------------------------------------------------------------------------------------------------------------------------------------------|
| **SA Merrill**: | I'm getting fucking sick                                                                                                                                 |
| **Defendant**: | What do you need? Food or water?                                                                                                                          |
| **SA Merrill**: | I'm gonna grab something to eat. Are those guys done in the house?                                                                                      |

(There is a brief discussion of the warrant authorizing seizure of Defendant's mobile phone, and SA Merrill seizes the phone.)

I think we're probably done talking, 'cause you're not feeling good and you don't want to talk . . .

**Defendant**: I'll talk some more, but not right now, alright? Give me a chance to unwind.

SA Merrill told Defendant that he was free to get some food or use the bathroom, but that he would not have complete freedom of movement around the house while the search warrant was being served.

After a break, SA Merrill and Defendant spoke again for approximately 14 minutes in a second recorded interview. At the conclusion of the second interview, Defendant was arrested on an unrelated outstanding warrant, and he was taken to the Cass County jail (the "jail").

SA Merrill and Officer Hanson interviewed Defendant again at the jail. SA Merrill first asked how Defendant was feeling, and Defendant said he was "alright." The following exchange ensued:

**SA Merrill**: You got the right to remain silent. Anything you can tell me, anything you may tell me, can be used against you in court, OK. You also have the right to a lawyer—if you can't afford one, the government will give you one. Mike, you don't have to talk to me. If you want me to get up and leave, I will.

**Defendant**: You've been a straight shooter with me, and I appreciate that.

The interview proceeded. SA Merrill said that he wanted more information so that he could help Defendant. SA Merrill said that he could not promise to get Defendant out of jail, but said he

could "make a good recommendation, and a good recommendation goes a lot farther than a bad recommendation." This interview continued for approximately 30 minutes, until Defendant asked to take a break to use the bathroom. After a break of approximately 5 minutes, the interview resumed, and continued for approximately 37 minutes.

In total, the interviewing officers spoke with Defendant for approximately 1 hour and 30 minutes in the yard outside Defendant's residence, and for approximately 1 hour and 7 minutes at the jail. Officer Hanson testified at the July 2, 2013, motions hearing that, despite his signs of illness, Defendant appeared lucid throughout the interviews, and that his answers tracked the questions that she and SA Merrill asked.

### B. Discussion

1. **Defendant's Motion to Suppress Evidence Obtained as a Result of July 23, 2011, Search and Seizure [Docket No. 57]**

Defendant makes no specific argument with regard to his challenge to the legality of the search warrants, but he merely asks for a four-corners review and a determination of whether the search warrant was supported by probable cause.

Because the Defendant has identified no specific evidence that he believes should be suppressed, and has offered no factual or legal grounds for suppression, the Court could recommend denying Defendant's Motion to Suppress Evidence Obtained as a Result of July 23, 2011 Search and Seizure, [Docket No. 57], solely on the basis that Defendant has failed to meet his burden of production. United States v. Jones, No. 09-cr-260 (DWF/RLE), 2009 U.S. Dist. LEXIS 112286, at *10 (D. Minn. Oct. 30, 2009) (Erickson, C.M.J.) (citing United States v. Mims, 812 F.2d 1068, 1074 (8th Cir. 1987); and United States v. Quiroz, 57 F. Supp. 2d 805, 822-23 (D. Minn. 1999)), adopted by 2009 U.S. Dist. LEXIS 112176 (D. Minn. Dec. 2, 2009) (Frank, J.). "Nonetheless, in an abundance of caution, we proceed with address[ing] the merits

of the Defendant's Motion by considering the probable cause detailed in the [w]arrant's supporting papers, and by examining for any other fatal deficiencies in the [w]arrant." Id. (citing United States v. Edwards, 563 F. Supp. 2d 977, 995 (D. Minn. 2008) (Mayeron, M.J.), adopted by 563 F. Supp. 2d 977, 984 (D. Minn. 2008) (Frank, J.).

### a. Standard of Review

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. The Eighth Circuit has explained that "[a]n affidavit for a search warrant need only show facts sufficient to support a finding of probable cause." United States v. Parker, 836 F.2d 1080, 1083 (8th Cir. 1987). Probable cause exists when "a practical, common-sense" evaluation of "all the circumstances set forth in the affidavit" demonstrate "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Gates, 462 U.S. at 231). "The existence of probable cause depends on whether, in the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (quoting United States v. Murphy, 69 F.3d 237, 240 (8th Cir. 1995) (quoting, in turn, Gates, 462 U.S. at 238)).

The sufficiency of a search warrant affidavit is examined using "common sense and not a hypertechnical approach." United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (citation and internal quotations omitted). "'When the [issuing judge] relied solely upon the supporting

affidavit to issue the warrant, only that information which is found in the four corners of the affidavit may be considered in determining the existence of probable cause.'" United States v. Wiley, No. 09-cr-239 (JRT/FLN), 2009 U.S. Dist. LEXIS 116899, at *6 (D. Minn. Dec. 15, 2009) (Tunheim, J.) (quoting Solomon, 432 F.3d at 827; edits in Wiley). "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'" United States v. Smith, 581 F.3d 692, 694 (8th Cir. 2009) (quoting United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)). Nevertheless, "[a] magistrate's 'determination of probable cause should be paid great deference by reviewing courts,'" Gates, 462 U.S. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . [concluding]' that probable cause existed." Gates, 462 U.S. at 238-39 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

### b. Analysis

Based on the information provided in the affidavit, there is ample evidence to conclude that probable cause existed for the issuance of the search warrant now at issue.

The search warrant applications provide extensive detail of an investigation that took place over the course of approximately one year. Specifically, the affidavits describe controlled purchases of fish from Defendant, including purchases at Defendant's fish camp on the Leech Lake Indian Reservation, purchases outside the boundaries of the Leech Lake Indian Reservation, and purchases where the fish were shipped out of state. Based on the totality of the circumstances, and considering the deference this Court must afford Magistrate Judge Keyes's decision in issuing the search warrant, this Court concludes that there was at least "'a fair probability that contraband or evidence of a crime' [would] be found" as a result of the issuance

of the search warrants.  <u>United States v. Velazquez-Ramos</u>, No. 11-cr-111 (MJD/FLN), 2011

U.S. Dist. LEXIS 67651, at *14 (D. Minn. Apr. 29, 2011) (Noel, M.J.) (quoting <u>Gates</u>, 462 U.S.

at 238), <u>adopted by</u> 2011 U.S. Dist. LEXIS 67588 (D. Minn. June 23, 2011) (Davis, C.J.).

Additionally, even if the Court were to conclude that there was not probable cause to

support the search warrant, the executing officers' good-faith reliance on that warrant would

militate against suppressing evidence obtained in the search.  <u>See</u> <u>United States v. Leon</u>, 468

U.S. 897, 919-21 (1984) (exclusionary rule does not apply "when an officer acting with objective

good faith has obtained a search warrant from a judge or magistrate and acted within its

scope").[21]  Defendant does not allege that any of the exceptions to the good-faith rule[22] are

applicable here; even if he did, the Court finds no support for any of these exceptions in the

present record.

Consequently, the Court recommends that the Defendant's Motion to Suppress Evidence

Obtained as a Result of Search and Seizure [Docket No. 15] be **DENIED**.

## 2. Defendant's Motion to Suppress July 23, 2011, Statements, Admissions, and Answers [Docket No. 55]

### a. Standard of Review

"[<u>Miranda</u>] prohibits the government from introducing into evidence statements made by

the defendant during a custodial interrogation unless the defendant has been previously advised

of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney."  <u>United</u>

---

[21] <u>See also</u> <u>United States v. Johnson</u>, 219 F.3d 790, 791 (8th Cir. 2000) ("Even if we thought the warrant affidavit did not establish probable cause, the good faith exception to the warrant requirement would apply because the affidavit was sufficient to allow an officer to reasonably believe probable cause existed."); <u>United States v. Rugh</u>, 968 F.2d 750, 753 (8th Cir. 1992) ("When police objectively and reasonably believe that probable cause exists to conduct a search based on an issuing judge's determination of probable cause, evidence seized pursuant to the ultimately invalid search warrant need not be suppressed.").

[22] <u>See</u> <u>Leon</u>, 468 U.S. at 923 (exceptions to the good faith rule when issuing judge "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth," "where the issuing magistrate wholly abandoned his judicial role," or when the warrant is "so facially deficient -- <i>i.e.</i>, in failing to particularize the place to be searched or the things to be seized -- that the executing officers cannot reasonable presume it to be valid").

States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way." Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). However, law enforcement officers "are not required to administer Miranda warnings to everyone whom they question." Oregon v. Mathiason, 429 U.S. 492, 495 (1977). "Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him in custody." Id.

The Eighth Circuit considers six (6) factors when determining whether a suspect is in custody:

> (1) Whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

United States v. Sanchez, 676 F.3d 627, 630 (8th Cir. 2012) (quoting United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990)). "The first three indicia are mitigating factors which, if present, mitigate against the existence of custody at the time of questioning. Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody." United States v. Axsom, 289 F.3d 496, 500-01 (8th Cir. 2002). Those factors, however, are not exclusive; "[t]he analysis depends upon a review of the totality of circumstances, and '[t]he ultimate test is whether a reasonable person in that position would have felt free to end the

interview.'" Sanchez, 676 F.3d at 630-31 (quoting United States v. Aldridge, 664 F.3d 705, 711 (8th Cir. 2011)).

The ultimate determination is based on the totality of the circumstances, with none of the above factors being dispositive, and a particularly strong showing on one factor may compensate for a deficiency on another factor. Griffin, 922 F.2d at 1347. The key inquiry is whether there was a formal arrest or restraining of a defendant's movement to the degree associated with a formal arrest. Stansbury, 511 U.S. at 322. "In answering this question, we look at the totality of circumstances while keeping in mind that the determination is based 'on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc) (quoting Stansbury, 511 U.S. at 322-23), cert. denied LeBrun v. United States, 543 U.S. 1145 (2005)). The Court must examine "both the presence and extent of physical and psychological restraints placed upon the person's liberty during the interrogation in light of whether a reasonable person in the suspect's position would have understood his situation to be one of custody." Axsom, 289 F.3d at 500 (internal quotation marks omitted).

### b. Analysis

Defendant argues that he was "in custody" for purposes of Miranda both while he was interviewed outside his home, and when he was interviewed at the jail. (Def.'s Supplemental Mem. [Docket No. 68], at 4-6). Additionally, Defendant argues that the Miranda warnings that SA Merrill provided, both outside Defendant's residence and at the jail, were inadequate. (Id. at 6-9).

Based on the present record in this case, the totality of the circumstances indicates that Defendant was **not** in custody when he was interviewed by officers outside his residence on July

23, 2011.  Therefore, during the first interview, the officers were not required to provide the Defendant with a rights warning consistent with <u>Miranda</u>.  Additionally, the <u>Miranda</u> warning provided by SA Merrill at the outset of the later jail interview, while imperfect, was sufficient to adequately advise Defendant of his rights.

      **i.   Defendant was not in custody during the interview outside his residence.**

SA Merrill clearly informed Defendant *twice* that he did not have to answer the interviewing officers' questions.  Within approximately the first 2 minutes of the first interview at Defendant's residence, SA Merrill told Defendant: "Nobody's forcing you to talk to us.  You don't have to talk to me if you don't want to."  Defendant acknowledged this statement, and the interview continued.  Just a few minutes later, SA Merrill told Defendant: "I want to talk to you, but you don't have to talk to me if you don't want to."  Again, Defendant continued with the interview.  Thus, the first <u>Griffin</u> factor mitigates strongly against a finding of custody.  <u>Sanchez</u>, 676 F.3d at 631 ("The first <u>Griffin</u> factor weighs heavily in favor of noncustody when the officers clearly inform a suspect that [he] is free to leave or decline questioning" (citations omitted).).  Although the interviewing officers did not tell Defendant before or during his questioning that he was not under arrest, "failure to inform [the defendant] that he was not under arrest is not dispositive."  <u>United States v. Lowen</u>, 647 F.3d 863, 868 (8th Cir. 2011) (citing <u>Untied States v. Flores-Sandoval</u>, 474 F.3d 1142, 1147 (8th Cir. 2007)).

Additionally, the third <u>Griffin</u> factor mitigates against a finding of custody, as the facts clearly demonstrate that, although the interview was instigated by law enforcement, Defendant voluntarily acquiesced to questioning.  When SA Merrill asked, near the beginning of the first recorded interview, whether he could ask Defendant questions, Defendant responded: "Yeah, let's just do it."  <u>See</u> <u>United States v. Brown</u>, 990 F.2d 397, 400 (8th Cir. 1993) ("Furthermore,

Brown voluntarily acquiesced to the interview.  When Esselbach asked Brown if he was willing

to talk to the officers, Brown responded: 'I'd like to get to the bottom of this, too, myself because

I don't know what's going on.'").  Defendant was friendly and cooperative, often volunteering

information even when not directly prompted by a question, which are factors the Eighth Circuit

considers when determining whether a defendant voluntarily acquiesced to questioning.  See

Axsom, 289 F.3d at 489, 502; United States v. Ollie, 442 F.3d 1135, 1138 (8th Cir. 2006). And

unlike Ollie, where the Eighth Circuit found that the defendant had not voluntarily acquiesced to

questioning, there is no evidence in the present case that Defendant answered questions solely in

"respon[se] to pressure."  442 F.3d at 1138.

Of the three potentially mitigating factors, only the second does not readily mitigate

against a finding of custody in this case.  Defendant was told there were certain things he could

not do while officers were searching his residence and, therefore, the Court finds that he did not

have "unrestrained freedom of movement."  However, at no time during the interview at his

residence was Defendant "restrained to a degree commonly associated with arrest."  Griffin, 922

F.2d at 1354; see also United States v. Mottl, 946 F.2d 1366, 1370 (8th Cir. 1991) (finding

second factor weighed in favor of non-custody in part because interviewing agents "did not

restrain [the defendant]'s freedom of movement to a degree associated with custody or formal

arrest").  Thus, the Court finds this factor to be neutral.  The three mitigating factors, on the

whole, weigh against a finding of custody.  See Griffin, 922 F.2d at 1347 (strong showing on one

factor may make up for deficiency in other factors).

Furthermore, only one of the three aggravating factors weighs in favor of custody.  The

fourth factor does not weigh in favor of custody, because there is no evidence that investigators

engaged in strong-arm tactics or deceptive stratagems.  As in Axsom, the interviewing officers

were armed but did not display their weapons.  <u>Axsom</u>, 289 F.3d at 502.  The interviewing

officers also did not use any deceptive stratagems, such as the good-cop, bad-cop routine.  <u>See</u>

<u>Brown</u>, 990 F.2d at 400 (8th Cir. 1993); <u>United States v. Carter</u>, 844 F.2d 368, 372 (8th Cir.

1989) ("Mutt and Jeff" technique contributed to police-dominated atmosphere (citing <u>Miranda</u>,

384 U.S. at 452, 455)).  Moreover, the interviewing officers "asked straightforward questions

and [Defendant] gave straightforward answers," <u>Axsom</u>, 289 F.3d at 502 (internal quotations

omitted), and they did not make any promises to Defendant.  Thus, the fourth factor does not

weigh in favor of a finding of custody.

Nor does the fifth factor weigh in favor of a finding of custody, because the interview

was not police dominated.  In considering this factor, courts examine such considerations as the

place and length of the interview.  <u>Griffin</u>, 922 F.2d at 1352.  The interview here took place

directly outside Defendant's residence.  There is a presumption that an interview in the

defendant's home is not police dominated.  <u>United States v. Czichray</u>, 378 F.3d 822, 826-27 (8th

Cir. 2004).  In <u>Griffin</u>, the Eighth Circuit indicated that an interview in a defendant's home might

be police dominated when, for example, officers isolate the defendant from family or friends

who might offer support, or when officers otherwise "assert[] their dominion over the

interrogation site." <u>Griffin</u>, 922 F.2d at 1355.[23]  However, none of those circumstances are

found in the present case.  Nor does the presence of officers executing the search warrant tip the

scales toward aggravating in favor of custody.  "[T]he fifth indicium is whether the *questioning*,

not the execution of the search warrant, was police dominated." <u>United States v. Wallace</u>, 323

---

[23] <u>See also</u> <u>Id.</u> at 1355, n.15:

It is the accepted logic that an interrogation in familiar surroundings such as one's home softens the hard aspects of police interrogation and moderates a suspect's sense of being held in custody.  Nonetheless, it is not difficult to envision that a suspect's sense of captivity can actually be intensified by the intrusive and intimidating environment created when agents of the law take control of a person's private residence.  After all, a person can not reasonably expect to be free anywhere if not within the refuge of his home.

(Internal citation omitted).  However, another panel of the Eighth Circuit subsequently questioned the <u>Griffin</u> court's holding that the interview in that case was police dominated.  <u>Czichray</u>, 378 F.3d at 827-28.

F.3d 1109, 1113 (8th Cir. 2003) (emphasis in original); see also Axsom, 289 F.2d at 503 ("While the execution of the search warrant was certainly police dominated, the interview between the two agents and [defendant] was not") (footnote omitted).  Finally, although the interview was not brief, running approximately 1 hour and 30 minutes, it was also not so lengthy as to militate a finding that it was police dominated.  Czichray, 378 F.3d at 825, 830 (interview in defendant's home lasting nearly seven hours was not custodial).[24]  Thus, the fifth factor does not weigh in favor of a finding of custody.

The sixth and final factor is the easiest to resolve: Defendant *was arrested* at the conclusion of the interview.  Although this aggravates in favor of a finding of custody, it is not dispositive, and the Court finds that it does not outweigh the significant mitigating factors.[25]

Finally, Defendant offers two additional arguments that he suggests weigh in favor of a finding of custody.  First, Defendant alleges that "Mr. Brown is diabetic, and maintains this condition with a regimen of food and four insulin injections a day.  He had not taken his first shot of the day, and told the agents this."  (Def.'s Supplemental Mem. at 2).  This argument is not borne out by the evidence in the record.  Even if the Court assumes that Defendant is diabetic, neither the recordings nor Officer Hanson's testimony demonstrates that Defendant made the interviewing officers specifically aware of his diabetes.  Defendant points to his retching as evidence of his condition, but the recording demonstrates that Defendant, himself, attributed his retching to "nerves" and "stress."  Finally, the Court notes that Defendant was allowed to get a drink and to use the bathroom; it strains credulity to believe that the interviewing officers would have allowed Defendant to get a drink, while at the same time

---

[24] See also Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993) ("The fact that the questioning extended for six or seven hours is not per se unconstitutionally coercive") (citing Sumpter v. Nix, 863 F.2d 563, 565 (8th Cir. 1988) (interview lasting seven-and-a-half hours not unconstitutional)).

[25] This is especially so since the Defendant's arrest was due to an outstanding warrant unrelated to the Operation Squarehook investigation for which Defendant was interviewed in this case.

knowingly denying him access to insulin. The Court finds that, with regard to this argument, Defendant has not offered evidence sufficient to aggravate in favor of a finding of custody.

Defendant also argues that SA Merrill knew that the interview was custodial, or he would not have informed Defendant of his right to remain silent. (Id.) Defendant offers no authority, and the Court can find none, for the novel proposition that an otherwise non-custodial interview becomes custodial when an officer affords a defendant a partial <u>Miranda</u> warning.

Upon the totality of the circumstances, the Court finds that Defendant was not in custody when he spoke with SA Merrill and Officer Hanson outside his residence on the morning of July 23, 2011. Defendant was twice told that he did not have to answer questions, and he voluntarily acquiesced to questioning. Defendant was at his own home, and the interviewing agents used no strong-arm tactics or deceptive stratagems. The interview, although lasting approximately 1 hour and 30 minutes, was not inordinately long or in any way otherwise police dominated.

Given the totality of the circumstances, during the first interview, a reasonable person in Defendant's position would not "have felt that he or she was not at liberty to terminate the interrogation and leave." <u>Thompson v. Keohane</u>, 516 U.S. 99, 112 (1995). Moreover, the Defendant's freedom was not restrained to a degree associated with formal arrest requiring a <u>Miranda</u> warning. Finally, the circumstances of the interview were not so police dominated as to subvert the Defendant's free will to voluntarily participate in the interview.[26]

---

[26] In a single paragraph at the end of his Supplemental Memorandum, Defendant briefly argues that he invoked his right to counsel during the interview outside his home. Early in the recorded interview, Defendant said, "Maybe I should get an attorney." SA Merrill responded that Defendant could get an attorney if he wanted to, and Defendant replied that he did not want to. SA Merrill stated, again, that Defendant did not have to continue the interview if he did not want to, and Defendant continued to answer the interviewing officers' questions for more than an hour.

"When a suspect requests counsel during an interrogation, police must cease questioning until counsel has been made available or the suspect reinitiates communication with the police." <u>United States v. Havlik</u>, 710 F.3d 818, 821 (8th Cir. 2013) (citing <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981)). "The Supreme Court clarified the <u>Edwards</u> rule [by holding that t]o implicate <u>Edwards</u>, a suspect 'must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'" <u>Id.</u> (quoting <u>Davis v. United States</u>, 512 U.S. 452, 459 (1994)). "Applying these

### ii. Defendant was properly Mirandized prior to his second interview at the jail.

Defendant concedes that he was given a Miranda warning at the beginning of his second interview at the jail on July 23, 2011, but he argues that the warning given was inadequate for two reasons. First, Defendant argues that the Miranda warning was insufficient because SA Merrill did not specify that Defendant had a right to counsel "'*during* questioning.'" (Def.'s Supplemental Mem. at 6 (quoting Duckworth v. Eagan, 492 U.S. 195, 198 (1989) (emphasis added by Def.)). However, Defendant's added emphasis is at odds with the Supreme Court's presentation in Duckworth, where the phrase "during questioning" takes on meaning only because that was the language used in the case before the Court. In other words, although the Supreme Court repeatedly uses the phrase "during questioning" in Duckworth, the Court at no time indicates that that particular phrase serves as any sort of cornerstone for an effective Miranda warning. In fact, "[t]he Supreme Court 'has never indicated that the 'rigidity' of Miranda extends to the precise formulation of the warnings given to a criminal defendant.'" United States v. Caldwell, 954 F.2d 496, 501 (8th Cir. 1992) (quoting California v. Prysock, 453 U.S. 355, 359 (1981) (per curiam)). Beginning with Rhode Island v. Innis, 446 U.S. 291 (1980), the Supreme Court has, on multiple occasions, referred to "Miranda warnings . . . or their equivalent." See, e.g., Id. at 297; Prysock, 453 U.S. at 360 (quoting Innis); Duckworth, 492 U.S. 195, 202 (quoting Innis); Florida v. Powell, 559 U.S. 50, 60 (2010) (quoting Innis). The Court does not find that SA Merrill's failure to specify that Defendant was entitled to the assistance of counsel *during questioning* materially altered Defendant's understanding of his Miranda rights.

---

principles, the Court in Davis held the statement '[m]aybe I should talk to a lawyer' was equivocal, and not an invocation of the right to counsel for purposes of Miranda and Edwards." Id. (quoting Davis, 512 U.S. at 462).

   The Court finds that Defendant did not request counsel by merely saying, "Maybe I should get a lawyer. The Supreme Court in Davis held that the statement, "Maybe I should talk to a lawyer," is equivocal and, therefore, not a request for counsel. Defendant's statement in the present case is substantially similar to the statement in Davis, and, therefore, was not a request for counsel.

Second, Defendant argues that the Miranda warning was insufficient because SA Merrill merely said that Defendant's statements ". . . can be used against you in court," and "not . . . that any statements *would* be used against him." (Def.'s Supplemental Mem. at 6 (emphasis added)). This argument is foreclosed by the Eighth Circuit's decision in United States v. Weeks, 645 F.2d 658 (8th Cir. 1981), in which the court wrote:

> Weeks concedes that he was advised of his Miranda rights before questioning. He argues, however, that they were inadequate in that the officer stated: ". . . any oral or written statements you make *may* be used against you in court." (Emphasis added). Weeks contends that this is insufficient in light of the Supreme Court's statement in Miranda that '(T)he warning of the right to remain silent must be accompanied by the explanation that anything said *can and will* be used against the individual in court.' Miranda v. Arizona, 384 U.S. 436, 469 (1966) (emphasis added). The departure from the precise text of Miranda is insufficient to significantly alter the warning given Weeks.

Weeks, 645 F.2d at 660. In fact, as noted by the Eighth Circuit in Weeks, the Supreme Court, itself, summarized its holding in Miranda with language substantially similar to that used by SA Merrill: "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make *may* be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Weeks, 645 F.2d at 660 n.1 (quoting Miranda, 384 U.S. at 444 (emphasis added in Weeks)).

The Court finds that the Miranda warning that SA Merrill provided to Defendant at the beginning of his second interview in the jail was sufficient to apprise Defendant of his rights. Consequently, the Court recommends that the Defendant's Motion to Suppress July 23, 2011, Statements, Admissions and Answers, [Docket No. 55], be **DENIED**.

IV.     **CONCLUSION**

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1. Defendant's Motion to Dismiss the Indictment [Docket No. 59] be **DENIED**;

2. Defendant's Motion to Dismiss the Indictment Due to Selective Prosecution, or for Additional Discovery [Docket No. 58] be **DENIED**;

3. Defendant's Motion to Suppress Evidence Obtained as a Result of July 23, 2011, Search and Seizure [Docket No. 57] be **DENIED**; and

4. Defendant's Motion to Suppress July 23, 2011 Statements, Admissions, and Answers [Docket No. 55] be **DENIED**.

Dated: August 14, 2013                                     s/Leo I. Brisbois
                                                           LEO I. BRISBOIS
                                                           United States Magistrate Judge

## N O T I C E

During the briefing period following the July 2, 2013, motions hearing, upon the requests of both Parties, this Court extended the original time for both parties to prepare and file their briefs on these Motions. Consequently, and in light of the pending trial date of September 23, 2013, the Court now finds it must reduce the time that the parties are allowed to file, and to respond to, objections to this Report and Recommendation.

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **August 23, 2013, at 3:00 p.m.**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within **seven days** of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.